Good morning. Good morning, your honors and Ms. Geyer. May it please the court, my name is Anna Williams. And I'm representing appellant Jason Smith today. Mr. Smith was sentenced to the maximum of 120 months for passing counterfeit checks. At issue here today is the intended loss amounts and the restitution amounts. So the main point that Mr. Smith was making in his appeal is that the district court erred in assessing the $2.2 million loss to the NetJets company, the jet leasing company. That was basically the driving force of his guideline. You could take all of the other intended loss amounts out and you would still get it the same 16 base offense level. The second part is whether the district court erred in ordering the restitution amount, some of which was presented to him minutes before sentencing and was kind of new return checks that he had not seen before, copies of which we didn't have even for the proceeding. Okay, turning to my main argument, the $2 million to NetJets. The finding there, as I said, is critical because it's the driving force behind his guideline and his eventual sentence. There was some evidence put on, but there was nothing showing that he had signed a binder agreement or submitted a payment. We're in the intended loss subcategory of the guideline, right? Yes, we're in the intended loss. Has any case addressed or considered the question of whether the more common question of whether a substantial step was accomplished that renders a defendant guilty of an attempted crime is the right way to look at the evidence in an intended loss case? I can't point to any cases today, Your Honor. It seems to me that it's a rather analogous situation. And if the substantial test step element of an attempted crime was the applicable principle, it seems to me we got more than one substantial step here by the woman that was doing the negotiating with the NetJets. Well, I think we would still need more because we don't have any proof that he took a substantial step. And this case... I thought it was clear she was his agent. She was working for his company, but this case is littered with Mr. Smith signing checks on false bank accounts. We're talking about the Rent-A-Jet situation. Is there any question from the record that... What was her name? Ms. Holcomb. Ms. Holcomb was acting on behalf of Mr. Smith or had apparent, if not actual, authority to deal with NetJets on behalf of Mr. Smith. She was working for his company, Your Honor. There's other indications where the district court didn't find intended loss as to do with off-duty officers. I know. But there she said, forget it. And essentially she... And here she didn't. Here she said, not the checks in the mail, but the contracts in the mail. But I believe it's still analogous to off-duty officers because she's essentially saying forget it when there's radio silence on the other end, when he keeps saying, hey, I didn't get the payment, I didn't get the sign. The binding has to be clear error, though. What's the hook for clear error here on the NetJets? I think... You brief it as though it's the absence of a signed contract, but I don't think that... Well, I think if you're... That can't be the dispositive fact. I think there is clear error, Your Honor. I think if you're looking at the overall context, and it was a very long evidentiary hearing, you have Mr. Smith consistently writing checks, writing checks, writing checks. Here you don't. And then you... Well, you have something more here, and that's why I'm wondering whether we even need to get into the agency. He says, and I'm quoting here, that he wanted a jet as soon as possible, and that she was to, quote, do whatever it took to secure it. I don't... I mean, that to me... And gave the woman his credit card. I don't know. If that's not an intended loss, I don't know what is. Well, I still think there needs to be more, because that's just what hearsay within hearsay is saying. Nothing showing Mr. Smith actually saying that. Well, yeah. I mean, yeah, it's hearsay, but you can use hearsay in a sentencing hearing, and that's pretty good evidence that he wanted her to do it, that he intended for that... He wanted her to get that transaction done. That's what he was saying. If he were to do that, he would have continued to submit payments, Your Honor. So I think there's still, like, more steps that he would have to take. Your abandonment argument may be a little bit stronger, that he may have intended the loss at some point, but that at some point he just said, to heck with this. I don't need the jet anymore, and I don't want to go for it. I mean, I think that's, you know, alternative, too, because... And that's where I'm pointing out it's analogous to off-duty officers, because there she specifically says, never mind. But when Mr. Lindvall is continuing to ask for the return binder agreement and the payment, she just becomes completely silent and unresponsive after that. Do you have any idea whether NetJet's, or whether this is in the record, whether NetJet accepts checks? Because you're putting a lot of weight on the fact that he didn't write a check here, that he gave her the credit card. Well, even if they only accept, like, a payment, there's no wire payment either. I mean, one of the exhibits is just a blank credit card authorization form. Okay. So you think, then, that... I'm just wondering whether the absence of a check, you're saying that even so, there's the absence of a wire transfer, too. There's just the absence of any form of payment or a signed contract. I mean, everything else, like, he's got his signature on something. I want to point to just a few cases where intended loss were found. United States v. Jordan, that's a Sixth Circuit case in 2008. They upheld intended loss, even though, obviously, it didn't go through, because it's intended loss. But where there was over $800,000 in checks mailed to a lockbox, even though the lockbox account had been frozen before funds could be withdrawn. And then United States v. Vervelo, Second Circuit case in 2004, upholding district court's intended loss calculation that included attempted cash advances drawn in excess of cash advance limit. So I just think that there needs to be more of a step here to show $2.2 million. That's the driving force. And the agent on the stand, you know, admits there's cases where people are interested in something. They want a quote, but they don't return any of the documents or the payment. And then that wasn't fraud, and he did say that. Well, maybe that gets to the agency question that Judge Loken was getting at, which is, my understanding, and maybe you're going to tell me I'm wrong about this, that she actually, this is the agency point, she actually submitted the credit card, and the credit card was declined. Am I right about that? No. He never received anything. So she never submitted a credit card to NetJets? There was no declination. Like, he never received any attempted payment is my understanding of it. Okay. I think you're saying the same thing I am. Are you saying that she never submitted the credit card as his agent to NetJets? The claim through the agent is that she did, but Mr. Lindvall never received any attempted payment. Okay. All right. I'm going to reserve the remainder of my time for rebuttal. Ms. Grabber? May it please the Court. My name is Amy Driver, Assistant United States Attorney, appearing on behalf of the government for the Western District of Arkansas, and I was also the attorney for the government at the district court level, as was Ms. Williams representing the appellant. We ask you to affirm the district court's decision as to the intended loss and the award of victim restitution as to the first prong, the intended loss. As this court has recognized in the Miel case, I believe that was authored by you, Judge Wallman, in determining intended loss, we look at the subjective intent, and the government proved through multiple avenues that his intent was to acquire the jet, the Gulfstream 450, and he had an urgency with doing so. Not only did we have the statement, and I will submit to you that these were rather specific by Ritanya Holcomb. Now, this was relayed through Agent Baker, but she specified that he wanted the jet to hold 12 to 15 people, to include his entourage and his wife, who actually turned out to be his girlfriend's hair and makeup crew. He wanted it as soon as possible and whatever it takes. These corroborate not only his intent, but also the urgency that he felt in obtaining this jet. We also had her emails, which substantiate exactly what she said. We also presented the binder agreement from NetJets. NetJets, the fact that you have people taking action on behalf of the defendants or the appellant's directives also substantiates that this was his intent. There were three people, I believe, from NetJets who were involved. Let's talk about the context. Justice Breyer always says context matters, and I agree with him. Most of these intended loss cases are fraud cases, and they're dealing in the business world. Here we're dealing in the political world. Yes, this is when it is different. Now we have a phony politician who is attempting to convince Iowa, wherever he was traveling, to pretend to be a candidate for president. He's trying to put on as good a show as possible. That's not unusual in the political world. He says, I've got this rally in, if I'm right about Iowa, Cedar Rapids, and I'm going to go there and I want to land in the fanciest jet possible. I want to have all the banners. I want to have the cheerleaders and the whole shebang. And he goes to Cedar Rapids, but his deal for the rented jet falls through. And so he doesn't get the jet in time to go to Cedar Rapids. And he says, well, forget the jet. That was only for Cedar Rapids. We didn't get it. The money didn't clear. Whatever happened. So why does that fit the intended loss, the purpose of the intended loss calculation under the guidelines? You're saying because he wasn't successful in obtaining the jet. Because he only wanted it for show, and when it was no show, he didn't want it anymore. Intended loss to whom? To the public in my Cedar Rapids hypothetical, that didn't get to see the fancy jet land? I don't see where the loss was. Well, the loss was to NetJets. Now, they would have, it would have been. They didn't lose a darn thing. I'm sorry, that's right. And it was not an actual loss. It was an intended loss. But as this court has recognized in U.S. v. Sewell, that the defendant need not be successful. The defendant there argued that his bribery scheme would have been impossible, that to be able to get all the juvenile medical patients in northeast Arkansas referred to his company. The court rejected that. This court rejected that argument. Well, but NetJets was, if they were smart enough to say, wait a minute, you know, you don't get the jet until I got something in hand that is sufficient. Absolutely. He didn't come up with the something in hand in time to get the jet for Cedar Rapids and then says to Ms. Holcomb and his troops, forget it. I don't think the purpose of the guidelines very well served by multiplying by a factor of five, his loss for sentencing purposes. Well, we don't just have the fact that he wanted the jet, and he mentioned it to Tanya Holcomb. He repeatedly told her to get it under contract. It is also corroborated by the fact that we have independent witnesses. There was the vice presidential candidate, the older veteran in Arkansas that he duped into becoming his vice presidential candidate who testified that appellants stated to him that he was going to purchase a Learjet for the campaign. He was in the process of getting it. What about the payment? I asked opposing counsel about the payment. I want to know exactly the evidence on the payment, if you would. So the testimony was that Tanya Holcomb stated that while they were in a hotel in I don't know where, but that he had given her a card. She didn't know what kind of card it was to pay for it. She tried to. After it didn't go through, she heard arguing between the appellant and his girlfriend, and then he stated later that it didn't go through because his account was tied up, that there were some other transactions happening. That was his common excuse on many things to many of his victims, that, oh, there must have been multiple things hitting the account at once. So there is evidence that there was an attempted payment and that he was upset when it didn't go through. Yes, absolutely. So as far as— Excuse me, Algo. Yes. What was that case, Casey, you were referring to earlier about the fraudulent payment to children or something? What was that case? Yes, that's the Sewell case, S-U-H-L. In that case, the court found that I believe the loss was over $100,000, that they included all of the—that he was intending to obtain all the patients, all the juvenile medical patients in the northwest area. His argument was that that would have been an impossibility, and I do have a copy of that that I can obtain the— I don't see it in your authorities. I'm sorry, yes. I did not cite it in the authority. This was something that I continued to reference. Can you send us the 28-J? Yes, sir. So we held that impossibility is not a defense to intended loss calculation? That's correct. The fact that it sounds incredulous does not diminish that he still intended that. I would also point out that the Ninth Circuit in U.S. v. Tillesey, and I could also send this reference. This is 697 Fed AB 910. The appellant argued, again, that he had absolutely no chance of receiving any money from his fraud scheme. The Ninth Circuit also rejected that precisely because the guidelines make clear the pecuniary loss could have been impossible or unlikely to occur. I believe that's comment three. Carrying that to an extreme, Mr. Smith made an attempt to buy Mar-a-Lago, wherever his place is in Florida, from President Trump. At what point does it reach the ridiculous? Your Honor, he had actually, and the record reflects, there was many situations where he was actually able to obtain five vehicles from AutoNation. Reading the facts of this case, who was it? To whom is he saying ascribed there's a sucker born every minute?  W.C. Fields. Fields or P.T. Barnum? Fields. Okay, that's what I thought. Well, he was a very charismatic individual, and he seemed sincere in person as well. But he was able to— Your argument might be we have to protect the world from the Smiths of the world. Yes, he was also able to obtain possession of a home through a fake check, and it was only whenever they were going to get law enforcement involved that he finally left the home. As you've mentioned, I think he's not above taking advantage of a disabled veteran. No, he's not. Does he have anything to commend himself? Perhaps I should ask. Well, anyway, I guess we're not moral judges. We're just moral arbiters or something like that. I believe he stated on the record in the sentencing transcript that he was on these things. Well, he has changed his ways, so we can take comfort from that. Yes. I don't mean to be cynical about it. Let's hope that he's truthful in what he said. Also— For the public's good. And, Your Honor, I would point out that while he was in the state of Arkansas, he was traveling around with an armed entourage in a blacked-out car with flags, and the district court recognized that the subjective intent was also supported by the fact that obtaining or landing on any tarmac in the United States in a Gulfstream 450 fit his objective of crafting an image of wealth and importance to hook other victims and further enrich himself. Your Honor, the government approved intended loss by a preponderance of the evidence, and the court did not err in its decision. I need to go on to the point about— Time's up. I'm sorry. Thank you very much. My comment would be it would have been helpful had you had that shul case in your brief. Yes, Your Honor. I apologize. Time's up, and you covered the most important issue in the case, so you don't get to reopen the other—do the other one now. So stick to the net, Jess. Okay. The other issue we take on the briefs. I think it's easily taken up on the briefs, Your Honor. I think so. I want to point out that we're not here to judge Mr. Smith as a person. We're just looking at the legal aspects. He could very— Besides, he's not going to pay a dime of this anyways. No. Unfortunately, people aren't going to get repaid. We're just looking at it from— The more grandiose a schemer, and I will call him that, a schemer like Smith is, the less likely he is that he will be held to his true desserts. Well, I mean, that brings the point is, you know, we could win our arguments and still end up with the same sentence, but we just want things to be done the right way. Let justice be seen to be done. That's right. His range with this net, Jess, thing went way over the statutory maximum, and the question is, does this severe increase from a transaction that never happened, does counting it reflect the purpose of the loss guidelines to wind up with a range that fairly reflects the seriousness of the offense? And this chap may wind up at the statutory max without the net flex, I think, for some of the reasons discussed, but I have trouble seeing where counting this caper in the loss category is a fair reflection of the seriousness of a serious offense. I agree, Your Honor. That, to me, is the issue. I'm out of time. Thank you, Your Honor. You can respond. Okay. I just feel like we should calculate the guidelines correctly, and then if we get to 120 months, we get there. But I feel like we need to be very cautious about inflating an intended loss on an already low burden where I feel like I think the court can look at clear error and find that that was clear error. The district judge talks about modus operandi, and the jet was part of that. Well, his modus operandi is just to keep trying to make payments that he can't come up with, and I find that that's lacking. Also, it's new to me the information about Ms. Holcomb repeatedly trying to do that. The only information I had was that she claimed that she made some payment and apparently mine changed or whatever. It didn't go through. It wasn't received. I feel like if we're going to hold him for something that basically is driving the entire guideline, that we need more. Thank you, Your Honors. Well, clear error is a steep hill. I'm inclined to think I would have made the opposite finding, but calling it clear error is something else. Thank you, Your Honors. It's harder to be an appellate. The case has been well briefed and argued. We'll take it under advisement.